IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RACHEL BETH POLKA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | NO. 3:26-cv-00923-K |
| *v.* | § | |
| | § | |
| MICHAEL SHANE SWANSON, | § | |
| | § | |
| *Defendant.* | § | |

**APPENDIX SUPPORTING MICHAEL SHANE SWANSON'S MOTION TO DISMISS PLAINTIFF'S ORIGINAL PETITION AND SUPPORTING BRIEF**


| EXHIBIT | DESCRIPTION | PAGES |
|---|---|---|
| 1 | Rachel Beth Ross Revocable Trust Agreement (with amendment) | 3-30 |
| 2 | August 4, 2025 Letter from Sarah Patel Pacheco to Shane Swanson (without attachments) | 31-33 |
| 3 | August 8, 2025 Letter from Lowell Noteboom to Sarah Patel Pacheco | 34-35 |
| 4 | August 20, 2025 Letter from Lowell Noteboom to Sarah Patel Pacheco and Chris Bankler | 36 |
| 5 | August 22, 2025 Letter from Chris Bankler to Lowell Noteboom | 37-40 |
| 6 | July 2, 2024 Memorandum from Shane Swanson to Michael Ross | 41-44 |

Respectfully submitted,

*/s/ George M. Kryder*
George M. Kryder
State Bar No. 11742900
gkryder@velaw.com
Jeremy M. Reichman
State Bar No. 24083722
jreichman@velaw.com
Michael C. Lee
State Bar No. 24109461
mlee@velaw.com
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Telephone: (214) 220-7700
Fax: (214) 220-7716

*Attorneys for Defendant*
*Michael Shane Swanson*

**CERTIFICATE OF SERVICE**

I certify that all current counsel of record have been served with a copy of the foregoing document through the Court's CM/ECF system according to Local Civil Rule 5.1 on April 29, 2026.

*/s/ Jeremy M. Reichman*
Jeremy M. Reichman

Exhibit 1

RACHEL BETH ROSS
REVOCABLE TRUST AGREEMENT

THIS AGREEMENT, made and executed this 20 day of January, 1999, by and between RACHEL BETH ROSS of Grand Prairie, Dallas County, Texas (the "Grantor"), and LARRY M. ROSS of Minneapolis, Minnesota (the "Trustee"),

W I T N E S S E T H :

**WHEREAS,** the Grantor desires to create a trust upon the terms and for the uses and purposes set forth in this Trust Agreement; and,

**WHEREAS,** the Grantor, contemporaneously with the execution and delivery of this Trust Agreement, has caused to be assigned, and does hereby assign, transfer, and deliver to the Trustee certain properties, the receipt of which is hereby acknowledged by the Trustee and a complete description of which is attached to this Trust Agreement as Exhibit A and incorporated herein by this reference;

**NOW, THEREFORE, IT IS AGREED** by the Parties that the properties herein described, and any other property which may be transferred, assigned, and delivered to the Trustee (all of which, and the portion thereof from time to time remaining in the hands of the Trustee, is hereinafter call the "Trust Estate") shall be held by the Trustee, in trust, to be managed, administered, and distributed in accordance with the following terms and provisions:

**ARTICLE 1**

1.1 The Grantor's family. The Grantor is a single person and has no children living at the date of this Trust Agreement.

1.2 The Grantor's power to amend or revoke. The Grantor reserves the power to amend or revoke this Trust Agreement, in whole or in part, with the consent of the Trustee or his successor, by written instrument signed by the Grantor and the Trustee and filed with the Trustee, provided the duties and responsibilities of the Trustee shall not be substantially

changed by any amendment without the Trustee's written consent and provided further that said amendment or revocation shall not be in violation of any statute of the State of Minnesota then in force and effect. This provision shall not limit the exercise of any power of appointment created by this Trust Agreement.

1.3 <u>Additional rights of and reservations by the Grantor</u>. The following powers and rights enumerated herein are reserved by the Grantor, to be exercised by the Grantor during the Grantor's lifetime without the consent or participation of the Trustee or any beneficiary of the trust.

(01) To add to the Trust Estate other items of real or personal property, acceptable to the Trustee, to be held and distributed under the terms of this Trust Agreement as a part of the Trust Estate.

(02) To examine the books and records of the Trustee at all reasonable times insofar as they relate to the trust.

(03) To direct the Trustee as to the retention, acquisition, sale, or other disposition of trust assets by written instrument filed with the Trustee. The Trustee shall be under no duty to wait for such directions before acting, but upon receipt by the Trustee, such directions shall have the same force and effect as though they were a part of this Trust Agreement and shall be followed if reasonably possible. Any asset acquired pursuant to such directions shall be retained as a part of and at the risk of the Trust Estate during the life and competency of the Grantor until the Grantor shall otherwise direct by written instrument filed with the Trustee, and the Trustee shall not be liable to anyone for any loss resulting from following such directions or from retaining any assets acquired pursuant to any such directions.

(04) To receive annually a written statement showing all cash transactions since the date of the last like preceding statement and containing an inventory of the assets of the Trust Estate as of the date of such statement. The Grantor's approval thereof shall be binding and conclusive as to all persons, and the Trustee need not account to any other person, either before or after the death of the Grantor, for any period for which the Trustee has accounted to and obtained the approval of the Grantor.

(05) To add insurance to the trust by assigning the policy to the Trustee or by making the Trustee hereunder the

beneficiary of the policy, such policy or policies to be described in a supplementary receipt executed by the Trustee, and, further to:

(a) receive or apply insurance dividends or distributive shares of surplus, disability benefits, surrender values, or proceeds of matured endowments;

(b) obtain and receive from the respective insurance companies such advances or loans on account of any of the policies as may be available;

(c) exercise any option or privilege granted in any policy;

(d) sell, assign, or pledge any policy; and

(e) change the beneficiary of any policy.

## ARTICLE 2

2.1 Payments of income to the Grantor during the Grantor's lifetime. During the lifetime of the Grantor, the Trustee shall pay to or expend for the benefit of the Grantor such sum or sums from the net income from the Trust Estate as the Trustee shall, in the Trustee's discretion, deem necessary or advisable from time to time. In the event that stock in a Subchapter S corporation is or becomes part of the Trust Estate hereunder, then any distributions of income as hereinbefore set forth shall be mandatory if required to maintain such Subchapter S status.

2.2 Payments of principal to the Grantor during the Grantor's lifetime. The Trustee shall pay to or expend for the benefit of the Grantor such sum or sums from the principal of the Trust Estate as the Trustee, in the Trustee's discretion, may determine.

2.3 Power of Appointment. Upon the death of the Grantor the balance of the Trust Estate, including principal and all undistributed income, shall be paid over and distributed to the Grantor's estate or to such other person or persons, in such amount or amounts and upon such conditions and estates, in trust or otherwise, with such powers, in such manner and at such time

or times as the Grantor shall appoint by a will specifically referring to this general testamentary power of appointment.

2.4 Disposition of Trust Estate upon the Grantor's death. Upon the death of the Grantor, the Trustee shall pay over and distribute any portion of the Trust Estate, including principal and all undistributed income, which the Grantor fails to dispose of by the exercise of the general testamentary power of appointment granted to the Grantor by paragraph 2.3 to the then living issue of the Grantor, by right of representation, or if there be no then living issue of the Grantor, to the then living siblings of the Grantor, in equal shares, and to the then living issue of any deceased sibling, by right of representation.

2.5 Distribution to person under the age of twenty-one. Any portion of the Trust Estate otherwise distributable under this article 1 to a person other than the Grantor who has not attained the age of twenty-one (21) years shall be held in a separate trust for the benefit of said person as follows:

(01) The Trustee shall pay to or expend for the benefit of said person such sum or sums from either the net income from or the principal of the trust as the Trustee, in the Trustee's discretion, may deem necessary or advisable to provide for the proper support, maintenance, health, and education of said person.

(02) At the time when said person attains the age of twenty-one (21) years, the Trustee shall pay over and distribute to said person the balance of the trust, including principal and all undistributed income.

(03) If said person dies before attaining the age of twenty-one (21) years, the balance of the trust, including principal and all undistributed income, shall be paid over and distributed to such other person or persons or to said person's estate, in such amount or amounts and upon such conditions and estates, in trust or otherwise, with such powers, in such manner and at such time or times as said person shall appoint by a will specifically referring to this general testamentary power of appointment.

(04) Any portion of the trust, including principal and all undistributed income, which said person fails to dispose of by the exercise of the general testamentary power of appointment granted to said person by paragraph 2.5(03) shall be paid over and distributed to the

then living issue of said person, by right of representation; or, if there be no then living issue of said person, to the then living siblings of said person, in equal shares, and to the then living issue of any deceased sibling of said person, by right of representation; or, if there be no then living issue of said person and no then living sibling of said person and no then living issue of a deceased sibling of said person, to the Grantor's then living siblings, in equal shares, and to the then living issue of a deceased sibling of the Grantor, by right of representation.

2.6 Contingent distribution. If at any time no person is living who is or may be entitled to receive any trust estate created hereunder, or any part thereof, under any of the foregoing provisions of this Trust Agreement, then any trust estate created hereunder, or such part thereof, shall be distributed to the Grantor's heirs-at-law, other than the Grantor's parents, determined as though the Grantor had then died intestate, a resident of the State of Minnesota, fully seized and possessed thereof.

**ARTICLE 3**

3.1 Payment of death taxes. The Trustee shall pay out of the Trust Estate all of the inheritance, estate, succession, and transfer taxes (including any interest and penalties concerning any such tax but excluding any generation-skipping taxes imposed by chapter 13 and any additional estate tax imposed by section 2032A(c) of the Internal Revenue Code), imposed by any domestic or foreign law on account of the Grantor's death or because of the transfer, disposition, or distribution of any property deemed a part of the Grantor's taxable estate at the Grantor's death.

3.2 Payment of debts and expenses. The Trustee may pay out of the Trust Estate, or reimburse the personal representative of the Grantor's estate for, such of the Grantor's just debts, the expenses of the Grantor's last illness, funeral and burial, and the expenses of the administration of the Grantor's estate, both probate and nonprobate, and the expenses of any ancillary administration, as the Trustee, in the Trustee's discretion, may deem necessary or advisable, taking into consideration any other

assets available for such purposes and the liquidity of such other assets.

3.3 Source of payments. Such payments, including taxes, shall not be apportioned to or among any person or persons holding any interest in or entitled to receive any item or items included in the Grantor's taxable estate. Notwithstanding any provision herein to the contrary, no assets received by the Trustee which, unless expended in making any payment authorized or directed by paragraph 3.1 or 3.2 would be exempt from federal estate tax, shall be expended in making any such payment.

## ARTICLE 4

4.1 Administrative powers of Trustee. The Trustee shall have the following powers, to be exercised as the Trustee, in the Trustee's discretion, determines to be in the best interests of the trusts created hereunder, such powers being in addition to and not in limitation of all other common law and statutory powers of trustees:

(01) Retention of property. To retain as a part of the trust estates any or all of the securities and properties transferred to or acquired by them hereunder, so long as the Trustee may deem such retention advisable or expedient, regardless of whether said securities and properties are of the kind and nature authorized by law for the investment of trust funds.

(02) Investment of funds. To invest and reinvest the available funds of the trust estates in, or exchange trust assets for, such securities and properties as the Trustee deems advisable regardless of whether such securities and properties are of the kind and nature authorized by law. Without in any way limiting the generality of the foregoing, the Trustee may invest or reinvest the available funds in, or exchange trust assets for, common and preferred corporate stocks, mutual funds, bonds, notes, debentures or other evidences of indebtedness or fractional interests in the same, equipment trust certificates or interests in any kind of an investment trust or any beneficial participation units in any common trust fund maintained and operated by any corporate trustee acting hereunder, or in any other kind of real or personal property.

(03) Cash funds. To retain cash funds uninvested for such reasonable periods of time as the Trustee shall deter-

mine; to deposit cash funds as a general deposit in a special account in the deposit department of any corporate trustee acting hereunder without liability for interest thereon.

(04) Disposition of property. To sell, grant options to buy, convey, transfer, assign, exchange, lease, mortgage, pledge or otherwise dispose of any or all of the properties of the trust estates, including both real and personal property, at such prices, on such terms, to such persons, in such portions, and in such manner as the Trustee may in each case deem proper and advisable, and for terms extending beyond the administration of the trust estates herein created.

(05) Stocks. To vote all stocks and to exercise all rights incident to the ownership of stocks, bonds or other securities or properties held in the trust estates and to issue proxies to vote such stocks and to exercise such rights; to enter into voting trusts for such period and upon such terms as the Trustee may determine; to sell or exercise any and all subscription rights and stock options; to sell or retain any and all stock dividends; to consent to or join in any plan of reorganization, readjustment, merger, consolidation or liquidation in respect to any corporation whose stocks, bonds or other securities are a part of the trust estates, including becoming a member of any stockholders' or bondholders' committee; to accept and hold any new securities issued pursuant to any plan of reorganization, readjustment, merger, consolidation or liquidation; to pay any assessments on stocks or securities or to relinquish the same, and to otherwise exercise any and all rights and powers and deal in and with the securities and properties held in said trust estates in the same manner and to the same extent as any individual owner and holder might do.

(06) Holding property. To hold securities and other properties in bearer form or in the name of a nominee or nominees without disclosing any fiduciary relationship; provided, however, that on the books and records of the Trustee said securities and properties shall constantly be shown to be a part of the trust estates and no such registration or holding by the Trustee shall relieve the Trustee from liability for the safe custody and proper disposition of such securities and properties in accordance with the terms and provisions hereof.

(07) Notes, bonds, and other evidences of indebtedness. To renew or extend or participate in the renewal or extension of any note, bond or other evidence of indebtedness or any other contract or lease, or to exchange the same, or to agree to a reduction in the rate of

interest or rent thereon or to any other modification or change in the terms thereof; or of the security therefor, or any guaranty thereof, in any manner and to any extent that the Trustee may deem advisable in the Trustee's discretion; to waive any default, whether in the performance of any covenant or condition of any such note, bond, or other evidence of indebtedness or any other contract release, or of the security therefor, and to carry the same past due or to enforce any such default as the Trustee, in the Trustee's discretion, deems advisable; to exercise and enforce any and all rights to foreclose, to bid in property on foreclosure; to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect to any such note, bond or other evidence of indebtedness or any other contract or lease, or the security therefor; to pay, compromise, and discharge with the funds of the trust estates any and all liens, charges or encumbrances upon the same, in the Trustee's discretion, and to make, execute and deliver any and all instruments, contracts or agreements necessary or proper for the accomplishment of any of the foregoing powers.

(08) Agents. To employ such agents, experts and counsel as the Trustee shall deem advisable, and to delegate discretionary powers to and rely upon such information or advice furnished by such agents, experts, or counsel; to receive in the Trustee's own behalf and to pay such agents, experts or counsel as the Trustee may employ for the protection or conservation of the trust estates reasonable compensation for services hereunder, and to deduct the same, as well as all other expenses and costs of administration, from the funds in the Trustee's hands. The Trustee shall have liability only for reasonable care in the selection of such persons or organizations.

(09) Settlement of claims. To adjust, compromise and settle debts, expenses, charges, taxes or claims upon the trust estates, or any part thereof, or upon or relating to any of the assets thereof.

(10) Tax elections. To claim trust administration expenses as income tax deductions when an election is permitted by law and when in the Trustee's judgment such action will reduce the total estate and income taxes payable by the Grantor's estate; provided, however, that no compensating adjustments shall be made between income and principal nor with respect to any devise in any will executed by the Grantor.

(11) Borrowing. To borrow money for the purpose of paying taxes or for any other purpose incidental to the

administration of the trust estates hereby created, or for the protection and preservation of the assets thereof, and to mortgage or pledge any assets of the trust estates for the payment thereof, for terms within or extending beyond the administration of the trust estates herein created.

(12) Receipt of additional assets. To receive from any source additions to the assets of the trust estates and to hold the same as a part of such trust estates.

(13) Liability and property insurance. To insure assets of the trust estates against damage or loss, and the Trustee against liability with respect to third persons.

(14) Advances of income. To advance income to or for the use of any beneficiary of a trust created hereunder, for which advance the Trustee shall have a lien on the future benefits of such beneficiary.

(15) Execute instruments. To execute and deliver all instruments which will accomplish or facilitate the exercise of any power herein granted to the Trustee.

(16) Undivided interests. To hold any two or more trusts or parts of such trusts created hereunder together as an undivided and consolidated whole in which such separate trusts or parts of such trusts shall have undivided interests, provided that no such holding shall defer the vesting of any trust estate in possession or otherwise.

(17) Real estate. To make ordinary or extraordinary repairs, improvements or alterations in buildings or other structures or in any other asset of the trust estates, and to remove or demolish any improvements. To raze existing or erect new party walls or buildings, alone or jointly with owners of adjacent property. The Trustee shall allocate any and all depreciation as to any real estate constituting a part of a trust estate to the then beneficiary or beneficiaries to whom income hereunder is distributed, and if any of such income is retained and accumulated in such trust estate, to the trust, in the proportions in which such income is distributed and/or retained and accumulated.

(18) Merger of trusts. To consolidate and merge any trust created hereunder with any other trust having substantially the same terms and beneficiaries. In determining whether the terms and beneficiaries of such other trust are substantially similar to those of the particular trust created hereunder, the determination of the

Trustee shall be conclusive and shall not be subject to review.

(19) Continuation of business enterprises. To retain any business interest, as shareholder, security holder, creditor, partner (whether general or limited), proprietor or otherwise, even though it may constitute all or a large portion of the trusts created hereunder; to participate in the conduct of any business or to rely upon others to do so, and take or delegate to others discretionary power to take any action with respect to its management and affairs which an individual could take as owner of the business, including the voting of stock and the determination of all questions of policy; to execute partnership agreements and amendments thereto; to participate in any incorporation, reorganization, merger, consolidation, recapitalization, liquidation or dissolution of any business or any change in its nature; to invest additional capital in, subscribe to or buy additional stock or securities of, or make secured, unsecured or subordinated loans to any business, with trust funds; to rely upon reports on the operations and financial condition of any business, without independent investigation; to elect or employ, as directors, officers, employees or agents of any business, and compensate, any persons, including a director, officer, or agent of any corporate trustee hereunder; to deal with and act for any business in any capacity, including any banking or trust capacity and the lending of money out of a Trustee's own funds, and to be compensated therefor; and to sell or liquidate any interest in any business.

(20) Transactions between fiduciaries. To enter into any transaction authorized by this Trust Agreement with any Trustee individually or in its corporate capacity, or with a corporation of which any Trustee is an officer, director, or shareholder, subsidiary or affiliate, or with trustees or representatives of other trusts or estates even though any such trustee or representative is also a Trustee hereunder, provided only that such action is not taken in bad faith. In any such transaction, the Trustee may purchase property or make loans on notes, securities and property even though similar or identical property constitutes all or a large portion of the balance of the trust estates held hereunder, and the Trustee may retain such property or note with the same freedom as though it had been an original part of the trust estates.

(21) Distribution of assets. To distribute the assets of the trust hereby created in kind or in cash, or partly in kind and partly in cash, and, in the Trustee's discretion, to allocate particular assets or portions

thereof or undivided interests therein to any one or more of the beneficiaries hereunder as the Trustee shall deem to be for the best interests of the beneficiaries of the trusts herein created; and, without limiting the generality of the foregoing, to allocate assets having different income tax bases among the beneficiaries hereunder in such manner, amounts, and proportions as the Trustee shall deem appropriate. For the purpose of any such distribution, to select such securities or other property as the Trustee may deem suitable, and to place such valuation upon such securities or other property as the Trustee may determine. The decision of the Trustee shall be final and binding upon all parties in interest.

(22) Life insurance. To retain as an investment of the Trust Estate any insurance policies on the life of any beneficiary of any trust herein created; to take out or otherwise acquire insurance on the life of any beneficiary of any trust or any person in whose life any trust or any beneficiary thereof may have an insurable interest, and to allow any such policy to lapse or surrender it for cash, or to exercise any other right of optional settlement thereunder (all premiums and assessments upon any policy to be paid out of the income otherwise available for distribution, and to the extent the income is insufficient, out of the principal, of any separate trust or trusts involved, adding the principal amount of any profits to the principal thereof; and payment to and the receipt of the Trustee to be a full discharge of the liability of any insurance company which insurance company shall not be required to see to the application of any such payment). The Trustee shall not be required in any event to pay the premiums on any policy held as a part of any trust estate hereunder or to see that any such policy is kept in force. Notwithstanding any provision herein to the contrary, in no event shall the powers granted under this paragraph be exercised or exercisable by an individual Trustee with respect to any policy of insurance on his or her life.

(23) Margin accounts. To establish margin accounts with any securities dealer or dealers, and to borrow money against securities held or purchased in any such account and use the proceeds of such borrowings for any lawful purpose, including the purchase of additional securities; to write call options on securities held in any trust created hereunder and to write call options on securities not held in any trust hereunder; to sell, purchase or buy-in any such call option on securities; to buy or sell put options on either securities or market indexes and future contracts on market indexes. The Trustee may enter into any transaction herein

authorized upon such terms as the Trustee deems advisable. It is the Grantor's intent that the Trustee shall be fully authorized and empowered to purchase securities on margin (and to allow securities dealers); to write both covered and uncovered call options on securities, and to sell, purchase or buy-in covered and uncovered call options even though such activities may be considered speculative and not generally suitable for Trustee. In the absence of bad faith or willful negligence the Trustee shall not be responsible for any loss resulting from any activity herein authorized.

4.2 <u>Allocation of receipts and disbursements</u>. Except as otherwise specifically provided in this Trust Agreement, the Trustee shall apply the rules stated in the Minnesota Revised Uniform Principal and Income Act in determining whether receipts shall be income or principal and whether disbursements shall be paid out of income or principal, and the rules of the Minnesota Revised Uniform Principal and Income Act shall be applied in apportioning income and principal between the beneficiaries of any trust created hereunder; provided, however, that income shall not be apportioned between successive income beneficiaries or between income beneficiaries and remaindermen, and, instead, upon the death of an income beneficiary all undistributed income, whether actually collected or accrued but uncollected, shall be apportioned to the next taker rather than to the estate of a deceased income beneficiary.

Pursuant to Minnesota Statutes, section 501.49, subdivision 1(b), unproductive property of the Grantor's estate or of any trust hereunder shall not be subject to the provisions of Minnesota Statutes section 501.58.

4.3 <u>Early termination of trust</u>. The Trustee shall terminate any trust created hereunder when the Trustee, in the Trustee's discretion, deems the continued administration thereof to be unduly burdensome or expensive. Upon such termination the Trustee shall pay over and distribute outright the balance of such trust, including principal and all undistributed income, to the persons and in the proportions determined as though such trust had terminated immediately prior to the time specified in this paragraph. Notwithstanding any provision of this paragraph

to the contrary, no discretion granted to the Trustee hereunder shall be exercisable by any Trustee who is a beneficiary of the trust which is to be terminated.

4.4 Perpetuities saving clause. Any trust held hereunder shall terminate, if it has not previously terminated, twenty-one (21) years after the death of the survivor of the Grantor and all individual beneficiaries named or described in this Trust Agreement who are living at the date of this Trust Agreement, and shall thereupon be distributed outright to the persons and in the proportions determined as though said trust had terminated immediately prior to the time specified in this paragraph.

4.5 Spendthrift clause. No title in any trust created hereunder or in the income therefrom shall vest in any beneficiary, and neither the principal of nor the income from any such trust shall be liable for the debts of any beneficiary. No beneficiary of any trust created hereunder shall have any power to sell, assign, transfer, encumber, anticipate or otherwise dispose of his or her interest therein as a beneficiary or distributee prior to the actual payment or distribution thereof by the Trustee to him or her, and any attempt of any beneficiary to do so shall be disregarded by the Trustee. Neither the principal of nor the income from any trust created hereunder shall be liable for the payment or satisfaction of alimony, maintenance, or any support obligation, to or for the benefit of a separated or divorced spouse of any beneficiary of such trust, pursuant to a dissolution, legal separation, or annulment proceeding to which said beneficiary is a party. This provision shall not limit the exercise of any power of appointment herein created.

4.6 Payments to beneficiaries under disability. The Trustee may make any distribution hereunder to a minor or other beneficiary determined by the Trustee to be unable to manage his or her personal finances, without liability to the Trustee and in the discretion of the Trustee, in any one or more of the following ways:

(01) Directly to such beneficiary.

(02) To the legal guardian of such beneficiary.

(03) Directly for the support, maintenance, health and education of such beneficiary.

(04) To the parent of such beneficiary.

(05) To anyone who shall have custody and care of the person of such beneficiary.

(06) In the case of a beneficiary who is a minor, and to the extent such distribution constitutes custodial property other than life insurance and annuity contracts, to a Trustee as custodian for such minor under the applicable Uniform Transfers to Minors Act.

4.7 Appointment of ancillary trustee. If any property which is or may become a part of any trust hereunder is situated in a state or states in which any Trustee is prohibited from holding real estate as Trustee, or in a foreign country (or in the event that the Trustee, in the Trustee's discretion, determines that the establishment of an ancillary trust with respect to any property held in trust hereunder would be in the best interests of such trust and the beneficiaries thereof), the Trustee is empowered to name an individual or corporate trustee (including a Trustee hereunder) qualified to act in any such state or foreign country in connection with the property situated therein as the ancillary trustee of such property. Any ancillary trustee so appointed shall have such powers and responsibilities as are delegated to him, her, or it by the Trustee, but shall exercise and discharge the same subject to such limitations or directions of the Trustee as shall be specified in the instrument evidencing the appointment. Any such ancillary trustee shall be answerable to the Trustee for all monies, assets, or other property entrusted to him, her, or it or received by him, her, or it in connection with the administration of such trust. The Trustee may remove any such ancillary trustee and may appoint a successor at any time as to any or all of the assets of such trust. The Trustee may, in the Trustee's discretion, require an appropriate bond or other security of any such ancillary trustee. Any instrument designating an ancillary trustee may contain such

provisions with respect to payment of income and principal to the trusts created hereunder or the beneficiaries thereof, payment of expenses with respect to ancillary trust property, termination of the ancillary trust, and administrative powers of the ancillary trustee as the Trustee, in the Trustee's discretion, may deem appropriate and consistent with the provisions of this Trust Agreement.

4.8 Generation-skipping transfers. The Personal Representative of the Grantor's estate, in said Personal Representative's discretion, shall allocate any portion of the Grantor's exemption under section 2631(a) of the Internal Revenue Code to any property as to which the Grantor is the transferor, including any property transferred by the Grantor during the Grantor's life as to which the Grantor did not make an allocation prior to the Grantor's death; the Grantor would expect but does not direct the Personal Representative to allocate said exemption first to the allocation made under paragraph 4.1(01).

The Trustee, in the Trustee's discretion, shall have the power to divide property in any trust being held hereunder with an inclusion ratio, as defined in section 2642(a)(1) of the Internal Revenue Code, of neither one hundred percent (100%) nor zero percent (0%) into two separate trusts representing two fractional shares of the property being divided, one to have an inclusion ratio of one hundred percent (100%) and the other to have an inclusion ratio of zero percent (0%).

4.9 Creation by Trustee of, and elimination of, general power of appointment. The Trustee (other than any beneficiary) is authorized in the Trustee's discretion with respect to all or any part of the principal of a trust for the benefit of a child of the Grantor (including a pecuniary amount), by an instrument filed with the trust records, (a) to create in said child of the Grantor a general power of appointment within the meaning of section 2041 of the Internal Revenue Code (including a power that requires the consent of the Trustee other than any beneficiary) that may dispose of such principal upon the death of said child, (b) to eliminate such power for all or any part of such principal

as to which such power was previously created, (c) irrevocably to release the right to eliminate such power, and (d) to divide the trust principal into two fractional shares based upon the then portion of the trust that would be includible in the gross estate of said child holding such power if he or she died immediately before such division (in which case the power shall be over the entire principal of one share and over no part of the other share) and each such share shall be administered as a separate trust hereunder unless the Trustee shall in the Trustee's discretion thereafter combine such separate trusts into a single trust which the Trustee is hereby authorized to do. In authorizing such action it is the Grantor's hope (but the Grantor does not direct) that a general power will be kept in effect when the Trustee (other than any beneficiary) believes the inclusion of the property affected thereby in said child's gross estate may achieve a significant savings in transfer taxes by having an estate tax rather than a Chapter 13 tax imposed on the property subject to the general power of appointment (which may also permit a greater use of the exemption of said child and said child's spouse under section 2631(a) of the Internal Revenue Code).

4.10 Residential real estate. If any real property used as the Grantor's principal residence becomes a part of any trust estate created hereunder, the Trustee may retain such property or sell the same or make arrangements for the use of such property by the Grantor's children or any one or more of them, and the Trustee may invest the proceeds from the sale of such property in another home for the proper accommodation of the Grantor's children and in like manner sell, in the Trustee's discretion, such substituted home and invest the proceeds thereof in the purchase of another home for the same purpose.

4.11 S Corporation stock. The Grantor recognizes that the trust may contain shares of stock in S corporations within the meaning of the Internal Revenue Code and that the Grantor may have signed one or more agreements binding the Trustee to preserve the S status of such corporations. Accordingly, it is

the Grantor's intent that the trust be construed and interpreted to be a "qualified subchapter S trust" within the meaning of the Internal Revenue Code, and the Grantor hereby authorizes the Trustee to take such actions, including reformation of the trust provisions or the obtaining of any instructions, as the Trustee shall deem necessary to preserve Subchapter S status in such corporation. If, in the opinion of the Trustee, it is not possible for the trust to so qualify, the Grantor authorizes the Trustee to distribute any shares in an S corporation in such trust to the current income beneficiary of such trust or to the guardian or conservator of such beneficiary or to a custodian for such beneficiary under a uniform transfers to a minor's act or to any other suitable representative for such beneficiary. The Grantor authorizes the Trustee to sell the shares of any S corporation on such terms as the Trustee shall deem advisable if in the opinion of the Trustee it is necessary to do so to avoid the loss of S status for any such corporation.

**ARTICLE 5**

5.1 Paragraph headings. The paragraph headings used in this Trust Agreement are for purposes of convenience only, and it is the Grantor's intention that no such heading shall be considered in the construction of any provision of this Trust Agreement or any related instrument executed by the Grantor.

5.2 Definitions. As used in this Trust Agreement:

(01) The term "issue" shall mean all persons who are descended from the person referred to, and shall include natural and adopted persons who had not attained twenty-one (21) years of age at the date of adoption as well as persons in gestation who are later born alive.

(02) The terms "child" and "children" refer to issue of the first generation.

(03) The masculine, feminine, or neuter gender, and the single or plural number, shall each be deemed to include the others whenever the context so indicates.

(04) References to chapters or sections of the Internal Revenue Code shall be to the Internal Revenue Code as

now enacted or hereafter amended, and shall mean and include such chapters or sections of the Internal Revenue Code and any provision of federal law as is, or may hereafter be, cognate to such chapters or sections.

## ARTICLE 6

6.1 Additional, alternate or successor trustee. If for any reason LARRY M. ROSS is unable or unwilling to serve or continue to serve as a Trustee hereunder, then LARRY M. ROSS may designate an alternate or successor Trustee. Such designation shall be in writing signed by LARRY M. ROSS, and said designated individual shall become a Trustee hereunder at such time as provided in said writing and upon filing a written acceptance of such office with the trust records. If LARRY M. ROSS fails to designate an alternate or successor Trustee as provided above, then PERCY N. ROSS of Edina, Minnesota shall become a Trustee hereunder upon filing a written acceptance of such office with the trust records. If for any reason PERCY N. ROSS is unable or unwilling to serve or continue to serve as a Trustee hereunder, then PERCY N. ROSS may designate an alternate or successor Trustee. Such designation shall be in writing signed by PERCY N. ROSS, and said designated individual shall become a Trustee hereunder at such time as provided in said writing and upon filing a written acceptance of such office with the trust records.

The individual Trustee, in the Trustee's discretion, may designate a corporate fiduciary as Trustee of any trust created under this Trust Agreement.

Any Trustee hereunder may resign at any time by an instrument in writing filed with the trust records. Such resignation shall be effective only upon the filing by the successor Trustee of a written acceptance of such office with the trust records.

The legal title to the trust property shall be and remain vested in the Trustee and any successor Trustee, individual or corporate, acting hereunder, without any act of conveyance or transfer by a resigning Trustee.

Any additional, alternate or successor Trustee appointed hereunder shall have all of the powers and responsibilities of the original Trustee. No successor Trustee shall be obliged to inquire into or be in any way accountable for the previous administration of the trust property.

If any corporate trustee acting hereunder is merged with another corporation or association, or is succeeded by another corporation or association, through consolidation or otherwise, the new corporation or association shall thereupon become the corporate trustee hereunder if such new corporation or association has trust powers. When authorized by statute or court order any corporate trustee acting hereunder may permit itself to be succeeded as such corporate trustee by another corporation or association having trust powers.

6.2 Removal of corporate Trustee and removal of situs of trusts. A majority of the group consisting of the then acting individual Trustees of any trust created hereunder may at any time remove any corporate Trustee acting as a trustee of said trust. The original or successor individual Trustee may, but need not, appoint a successor corporate Trustee. Such action shall be taken by filing written notice thereof with the corporate Trustee being removed, which notice shall set forth the name of the successor corporate Trustee, if any. In addition, a majority of the group consisting of the then acting individual Trustees of any trust created hereunder may at any time remove the situs of said trust to any other state in the United States, and from such state to another state or back to the state of original situs, and if the situs of said trust is so removed from any state, a majority of said group may remove any corporate Trustee then acting hereunder and may, but need not, appoint a successor corporate Trustee. If a majority of said group removes the situs of said trust from any state, such action shall be taken by filing written notice thereof with any corporate Trustee then acting, which notice shall set forth the place to which the situs of the trust is being removed and, if any corporate Trustee

then acting is also being removed, the name of the successor corporate Trustee, if any.

6.3 Exercise of discretion. No individual Trustee hereunder shall participate in the exercise of any discretion of the Trustees to distribute income or principal to himself or herself or to discharge a legal support obligation with respect to his or her issue, or to terminate and distribute all or any part of any trust estate created hereunder to himself or herself, and such discretion shall be exercised solely by the other Trustee acting hereunder.

6.4 Custody of assets. In order to relieve any individual Trustee of the details of the administration of the trusts created hereunder, any corporate Trustee acting hereunder shall have custody and care of all assets belonging to the trust estates, handle all receipts and disbursements, and attend to all accountings required in the trusts created hereunder.

6.5 Reports to Grantor. The Trustee or Trustees acting hereunder shall report to Grantor from time to time and not less than as of June 30 of each calendar year and as of December 31 of each calendar year the condition and composition of the Trust, including its assets and liabilities, its receipts and disbursements and, in general, all matters involving significant transactions relating to the Trust. In this connection, all other provisions herein to the contrary notwithstanding, the Trustee or Trustees acting hereunder shall notify Grantor immediately of any transactions regarding the Trust which involve a total consideration of One Hundred Thousand and No/100 ($100,000.00) Dollars or more. As used herein, reports to the Grantor shall be made by the Trustee or Trustees acting hereunder within thirty (30) days of the date of any cut-off period for any such report and, in the case of significant transactions involving One Hundred Thousand and No/100 ($100,000.00) Dollars or more, the report to Grantor shall be made orally to Grantor within three (3) hours prior to the initiation of such significant transaction and confirmed to Grantor in writing within forty-eight (48) hours of the completion of such significant transaction. In the event any significant transaction is to be conducted and concluded herein on behalf of the Trust, if there are two (2) Trustees, then both Trustees must join in the conduct of the transaction. "Significant transaction" as used herein shall mean any transaction involving One Hundred Thousand and No/100 ($100,000.00)

Dollars or more.

6.6 Majority rule. At any time when more than two Trustees of any trust created hereunder are empowered to take particular action with respect to such trust, then any such particular action taken by a majority of such empowered Trustee shall have the same effect as if done or executed by all of such empowered Trustees. Any empowered Trustee who, in signed instruments delivered to the other Trustee and filed with the trust records, dissents from any action taken or any failure to act, pursuant to the provisions of the preceding sentence, shall be relieved of all responsibility therefor.

6.7 Delegation by individual Trustee. Any individual Trustee acting hereunder may at any time by a signed instrument filed with the trust records delegate to any other Trustee any or all powers and discretions conferred under this Trust Agreement (including the power to assign or convey any trust property on behalf of the Trustee) either for a specified time or until the delegation is revoked by a similar instrument. Any person dealing in good faith with any Trustee may rely without inquiry upon the Trustee's certificate with respect to any delegation. No individual Trustee acting hereunder shall be liable to any person, whether or not such person is a beneficiary of any trust created hereunder, for any act taken by the Trustee to whom he has delegated the authority to take such act.

6.8 Disability of Trustee. At any time while any Trustee acting hereunder, in the opinion of the other Trustee then acting hereunder and a competent medical advisor, is incapacitated through illness, age or other cause, such other Trustee shall have full power and authority to exercise all powers granted to the Trustees herein, and such incapacitated Trustee shall not be liable for any act or omission of such other Trustee or Trustees taken while he or she is incapacitated.

6.9 Liability of Trustee. No person or corporation acting as a trustee hereunder shall at any time be held liable for a mistake of law and/or fact, for an error of judgment, nor for any loss or injury coming to any trust estate or to any beneficiary thereof (or to any beneficiary under this Trust Agreement, or to any other person), except as a result of actual fraud or willful misconduct on the part of the trustee to be charged. Further, any Trustee acting hereunder, under

the above standard, shall be severally held to the faithful performance of his or her own acts, but shall not be liable for the acts or omissions of any other Trustee in which acts or omission the Trustee sought to be held did not participate or concur.

6.10 Waiver of qualification of trust. The Grantor waives any statutory or other requirement that the appointment of the Trustee be confirmed, or that any trust be qualified in any court of competent jurisdiction. This provision shall not, however, prevent any trust beneficiary after the death of the Grantor from requesting that the appointment of any Trustee be confirmed, or that the accounts of the Trustee be heard or approved in court.

6.11 Waiver of bond. The Grantor directs that no bond be required of any Trustee acting hereunder. If for any reason a bond is required by any court of competent jurisdiction, then the Grantor requests that it be made as nominal as possible.

6.12 Interpretation. This trust has been accepted by the Trustee in the State of Minnesota, and this Trust Agreement has been delivered to the Trustee in said State, and all questions of law arising hereunder shall be determined in accordance with the laws of the State of Minnesota.

**IN WITNESS WHEREOF,** RACHEL BETH ROSS as the Grantor has hereunto set her hand, and LARRY M. ROSS as Trustee has hereunto set his hand, both as of the day and year first above written.

In Presence Of:

**AS TO GRANTOR**

Dandy Moore

Judy Williams

RACHEL BETH ROSS, GRANTOR

**AS TO TRUSTEE**

Katherine Tait

Christine

LARRY M. ROSS, TRUSTEE

# ACKNOWLEDGMENTS

STATE OF TEXAS §
§
COUNTY OF DALLAS §

BEFORE ME, the undersigned authority, on this day personally appeared RACHEL BETH ROSS, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she has executed the same for the purposes and consideration therein expressed.

WITNESS MY HAND and Seal of Office this 20th day of January, 19 89.

Rhonda Ramsey
NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

(SEAL)

RHONDA RAMSEY
Notary Public
State Of Texas
My Comm. Exp. Oct. 17, 1989

Rhonda Ramsey
Notary's Name Printed
My Commission Expires: 10/17/89

STATE OF MINNESOTA §
§
COUNTY OF §

BEFORE ME, the undersigned authority, on this day personally appeared LARRY M. ROSS, as Trustee, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he has executed the same for the purposes and consideration therein expressed, and in the capacity therein stated.

WITNESS MY HAND and Seal of Office this 1st day of June, 19 89.

Diane M. Stuber
NOTARY PUBLIC IN AND FOR THE STATE OF Minnesota

( S E A L )

Diane M. Stuber
NOTARY PUBLIC — MINNESOTA
WRIGHT COUNTY
My commission expires June 29, 1989

Diane M. Stuber
Notary's Name Printed
My Commission Expires: June 29 1989

EXHIBIT A

RACHEL BETH ROSS

REVOCABLE TRUST

1,500 shares of Polyco, Inc., a Texas corporation

150 shares of Poly Trucking, Inc. a Texas corporation

150 shares of Western Poly, Inc., a Texas corporation

**FIRST AMENDMENT TO**
**RACHEL BETH POLKA**
**REVOCABLE TRUST AGREEMENT**

**THIS FIRST AMENDMENT** to the RACHEL BETH POLKA REVOCABLE TRUST AGREEMENT, is entered into this 8th day of December, 2021, by RACHEL BETH POLKA, as Grantor (the "Grantor"), and M. SHANE SWANSON, as Trustee (the "Trustee").

**W I T N E S S E T H:**

**WHEREAS**, the Grantor created the RACHEL BETH POLKA REVOCABLE TRUST (the "Trust"), by written agreement dated January 20, 1989 by and between RACHEL BETH POLKA, as Grantor, and LARRY M. ROSS, as Trustee (the "Original Trust Agreement"); and

**WHEREAS**, the Grantor has, pursuant to the terms of the Original Trust Agreement, assigned, transferred and delivered to the Trustee certain properties which were received, held and managed by the Trustee in accordance with the provisions of said Original Trust Agreement; and

**WHEREAS**, the Grantor reserved the right under the Original Trust Agreement to amend or revoke, in whole or in part, the Original Trust Agreement, with the consent of the Trustee, by written instrument signed by the Grantor and the Trustee; and

**WHEREAS**, the Grantor now desires to amend the Original Trust Agreement, in part.

**NOW, THEREFORE**, the undersigned, RACHEL BETH POLKA, hereby amends the RACHEL BETH POLKA REVOCABLE TRUST AGREEMENT, in part, as follows:

**ITEM 1**

***The Grantor hereby amends the Original Trust Agreement by appointing RACHEL BETH POLKA as a Co-Trustee of the Trust.***

**ITEM 2**

Except as amended and modified by this First Amendment to the Original Trust Agreement, the Grantor hereby ratifies and confirms the provisions of the RACHEL BETH POLKA REVOCABLE TRUST AGREEMENT.

***[signature page follows]***

**IN WITNESS WHEREOF**, I, **RACHEL BETH POLKA**, as Grantor, and M. SHANE SWANSON, as Trustee, have signed and sealed this FIRST AMENDMENT to the RACHEL BETH POLKA REVOCABLE TRUST AGREEMENT on the day and year indicated above.

Rachel Beth Polka, Grantor

**CONSENT TO AMENDMENT**

M. Shane Swanson, Trustee

**ACCEPTANCE OF APPOINTMENT AS CO-TRUSTEE**

Rachel Beth Polka

**DELEGATION OF DISCRETIONARY POWERS
TO RACHEL BETH POLKA**

Pursuant to authority granted under the provisions of the **RACHEL BETH POLKA REVOCABLE TRUST AGREEMENT**, under agreement dated January 20, 1989, as amended, between RACHEL BETH POLKA, as Grantor, and LARRY M. ROSS, as Trustee (the "Trust"), RACHEL BETH POLKA and M. SHANE SWANSON do hereby delegate to RACHEL BETH POLKA, a Co-Trustee of the Trust, all discretionary powers and authorities granted to the Trustees of the Trust, including, without limiting the generality of the foregoing, all powers and authorities respecting the purchase, sale and exchange of trust assets, assignment or conveyance of trust property, distribution of income and principal to any beneficiary of the Trust, and management of any business interest which is held as part of the Trust.

This delegation shall remain in full force and effect until revoked by a written instrument signed by the delegating Trustee and filed with the records of the Trust. Any person dealing in good faith with the Co-Trustee to whom discretionary powers are hereby delegated may rely upon such Co-Trustee's certificate with respect to such delegation.

This instrument shall be effective as of December 8th, 2021.

Rachel Beth Polka

M. Shane Swanson

**DELEGATION OF DISCRETIONARY POWERS TO M. SHANE SWANSON**

Pursuant to authority granted under the provisions of the **RACHEL BETH POLKA REVOCABLE TRUST AGREEMENT**, under agreement dated January 20, 1989, as amended, between RACHEL BETH POLKA, as Grantor, and LARRY M. ROSS, as Trustee (the "Trust"), RACHEL BETH POLKA and M. SHANE SWANSON do hereby delegate to M. SHANE SWANSON, a Co-Trustee of the Trust, all discretionary powers and authorities granted to the Trustees of the Trust, including, without limiting the generality of the foregoing, all powers and authorities respecting the purchase, sale and exchange of trust assets, assignment or conveyance of trust property, distribution of income and principal to any beneficiary of the Trust, and management of any business interest which is held as part of the Trust.

This delegation shall remain in full force and effect until revoked by a written instrument signed by the delegating Trustee and filed with the records of the Trust. Any person dealing in good faith with the Co-Trustee to whom discretionary powers are hereby delegated may rely upon such Co-Trustee's certificate with respect to such delegation.

This instrument shall be effective as of December 8, 2021.

Rachel Beth Polka

M. Shane Swanson

2066128.0001/155088224.1

Exhibit 2

Jackson Walker LLP

Sarah Patel Pacheco
(713) 752-4276 (Direct Dial)
spacheco@jw.com

August 4, 2025

**Via E-Mail**
Mr. Shane Swanson
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Shane.Swanson@stinson.com

**Re: Legal Review for Rachel Polka – Initial Document Requests**

Dear Mr. Swanson:

Based on your suggestion that she seek independent counsel, my firm has been engaged by Rachel Polka to advise regarding the trusts and closely held business interests in which she holds a current or contingent interest. While it appears that she has some information, there is still material information that she has not been provided after numerous requests and notwithstanding her trustee's obligations to do so without such request. Thus, we have filed a petition seeking to address those issues with her trustees, and I am enclosing a copy for your information as Ms. Polka's counsel.

In the meantime, we are hopeful that you, as Ms. Polka's longtime advisor and the person who recently recommended she seek additional counsel, can provide us or help us with the gathering of the information discussed below.

Currently, in addition to the primary trust of which Ms. Polka is a beneficiary (the 2006 Irrevocable Trust), a principal focus of our review and analysis is the attached corporate and partnership ownership diagram captioned "Ownership Structure as of 1/1/2024." To ensure I understand Rachel's direct and indirect interests, as well as the interests held through the various irrevocable trusts, I need both the underlying documentation that supports the January 1, 2024 chart and any updates or amendments made since that date.

To that end, please forward the documents identified below, along with any other documents you believe would be helpful for my analysis.

**A. <u>Entity-Level Information</u>**

1. Current capitalization table (showing percentage and class of ownership), governing documents, and any shareholder, partnership or operating agreements—together with all amendments—for each of the following entities:
   - Poly-America Holding Company
   - Olympic Finance Company
   - MARS Partners, Ltd.
   - Western Poly Corporation

- Poly-Trucking, Inc.
- Up North Plastics, Inc.
- MARS II, Inc.
- BF Nelson Corporation
- Poly-America, LP and its general partner Poly-America GP, LLC
- Poly-West, Inc.; Carolina Poly, Inc.; Poly-America International, Inc.; and any other subsidiary or affiliated company reflected on the 1/1/2024 structure chart
- Mars GP, LLC; Ramko Partners Ltd.; and any tiered or special-purpose entities (e.g., Q-SUBs)

2. Copies of all Ms. Polka's (or her trusts) Schedule K-1s and, where applicable, Form 1041 for each trust, and Forms 1120-S or 1065 for each entity for the most recent taxable year.

3. Confirmation of all S-corporation elections (including any QSST or ESBT elections) in effect for shareholders that are trusts. Please include the election forms and IRS acceptance letters.

**B. <u>Trust Information</u>**

1. The fully executed trust agreements (with all amendments, restatements, and merger documentation) for the following:
   - 2006 irrevocable trust u/a/d Nov. 7, 2006 (Adam B. Ross 2006 Irrevocable Trust I).
   - 2007 irrevocable trust (Larry M. Ross 2007 Irrevocable Trust) merged into the 2006 trust in 2022 (together with the agreement evidencing the merger).
   - Rachel Beth Polka 2024 Family Revocable Trust.
   - Rachel Beth Polka Revocable Trust dated 1989 (for historical context; I understand it may now be unfunded) and any documents that reflect the transfer of assets from this trust to Rachel, the 2024 Family Revocable Trust, or otherwise.
   - Rachel B. Polka 2013 Irrevocable Insurance Trust.
   - The 1994 GRATs that created Rachel's 2019 Continuation Trust.

2. Current status of the Randal A. and Rachel B. Polka Joint Revocable Trust – presumed to be terminated after divorce was finalized.

3. The most recent filed federal and state income tax returns for the following trust (noting that many of these trusts ceased to be grantor trusts in 2018):
   - Each of the five 2008 Irrevocable Trusts for Rachel's children.
   - Adam B. Ross 2006 Irrevocable Trust I.
   - Kyle Ross 1999 Irrevocable Gift Trust.
   - Rachel B. Polka 2013 Irrevocable Insurance Trust.
   - Any QSST or ESBT associated with the foregoing.

4. All federal gift tax returns (Form 709) for gifts by Rachel and any other returns you can provide which might reflect the GST status of the various trusts.

5. Current balance sheets or other statements of assets and liabilities for the Adam B. Ross 2006 Irrevocable Trust I, Rachel B. Polka 2013 Irrevocable Insurance Trust, the Rachel Polka Revocable Trust and the Rachel B. Polka 2024 Family Revocable Trust,

including:
• Detailed schedules of marketable securities, closely held stock, partnership interests, real property, insurance policies, notes receivable and any split-dollar receivables or premium loans.
• Outstanding liabilities, including notes payable to related parties (e.g., premium financing for the 2013 Insurance Trust).
• Current trustee and protector designations and any resignation or acceptance instruments since the last amendments.

6. Life-insurance materials:
   • John Hancock Policies.
   • Any other life-insurance policies owned by, or pledged to, the trusts, together with policy statements showing current cash value and death benefit.

**C. <u>Additional Items</u>**

1. A copy of the "Ownership Structure as of 1/1/2024" chart in native format so that we may trace percentage interests more precisely. If a revised chart exists as of any later valuation date, please provide that as well.

2. Any correspondence, memoranda, or resolutions from 2018-present that relate to:
   • The trusts' decisions to terminate grantor-trust status.
   • QSST or ESBT elections, amendments, or consents.
   • Any proposed or completed sales, redemptions, or recapitalizations of family-owned entities.

3. Documentation relating to the administration of Rachel's personal residences, specifically:
   • 3833 Wentwood Drive LLC (University Park home).
   • 10331 Strait Lane, and any associated LLC or management agreement.

I would appreciate receiving electronic copies at your earliest convenience. If certain items will require additional time to assemble, please provide what you have readily available and let me know the expected timeline for the balance. I would hope that the majority, if not all, could be provided by August 8, 2025.

Please feel free to contact me if you have any questions or would like to discuss these requests. I am happy to coordinate a conference call to walk through any of the items in greater detail.

Thank you for your prompt attention to this matter.

Sincerely,

*/s/ Sarah Patel Pacheco*

Sarah Patel Pacheco

STINSON

Exhibit 3

Lowell Noteboom
**PARTNER**
DIRECT: 612.335.1573
OFFICE: 612.335.1500
lowell.noteboom@stinson.com

August 8, 2025

Sarah Patel Pacheco
spacheco@jw.com

Sent by e-mail only

Re: Your Legal Review for Rachel Polka – Initial Document Requests

Dear Ms. Pacheco:

I serve as Assistant General Counsel at Stinson LLP. We are in receipt of your letter of August 4, 2025, and have spent considerable time determining what documents we are able to produce in response to your requests. As you know, Mr. Swanson has worked with several members of the Ross family and their corporate entities for a number of years. Some of the documents included in your request are privileged and belong to other family members, and those privileges have not been waived. Additionally, many Ross family files are in paper copy only and are stored offsite. While we need some additional time, I am writing to provide a status update.

We have organized the requested documents as follows:

1. Documents we are able to provide. We will send copies of any documents requested that (i) have previously been shared with Rachel Polka, (ii) are included in files for which she is the client, or (iii) to which she was a signatory. We are gathering those documents and will provide them to you next week. From your letter descriptions, these documents are:

    a. Trust agreements and other documents affecting the 2006 Irrevocable Trust, 2007 Irrevocable Trust, 2024 Revocable Trust, 1989 Revocable Trust, 2013 Insurance Trust, and 1994 GRAT (B.1 and B.5 of your letter)

    b. Status of Joint Revocable Trust and documents showing transfers from the 1989 Revocable Trust (B.1 and B.2 of your letter)

    c. Rachel's gift tax returns (B.4 of your letter); Stinson has returns from 2003-2009; there are earlier returns that we do not have and which can be requested from Boulay.

    d. Balance sheets for the 2006 Irrevocable Trust, the 2013 Insurance Trust, the 2024 Revocable Trust, and the 1989 Revocable Trust (B.5 of your letter)

    e. John Hancock policies and value information (B.6 of your letter)

    f. Ownership structure chart (C.1 of your letter)

    g. Documentation for residences and LLC holding residence (C.3 of your letter)

2. Documents we do not maintain. There are some categories of documents requested which Stinson does not prepare or maintain and therefore cannot provide:

    a. Documents related to corporate organization, e.g., capitalization tables, of various Ross family entities – these will need to be requested from the companies (A.1 of your letter)

    b. K-1's, S-corp filings, and other tax filings related to Rachel and the irrevocable trusts – these will need to be requested from Boulay (A.2, A.3, and B.3 of your letter)

3. Documents which invoke another client's privilege. There are a few documents requested which Stinson cannot share without permission from another client. If you would like us to approach Michael Ross, Adam Ross, Stephanie Ross, Olympic Finance, and/or Poly-America for approval to release these documents, please advise:

    a. Gift tax returns filed by anyone other than Rachel (B.4 of your letter )

    b. Correspondence and memoranda prepared for trustees of irrevocable trusts (C.2 of your letter)

    c. Correspondence and memoranda prepared for Ross family entities (C.2 of your letter)

We will assemble the documents we are able to share (category one above) and send you electronic copies next week.

In the meantime, please advise if you have questions or further information that will assist us in assembling the requested documents.

Thank you.

Sincerely,

**Stinson LLP**

Lowell Noteboom

LJN:aaj

STINSON

Exhibit 4

Lowell Noteboom
**PARTNER**
DIRECT: 612.335.1573
OFFICE: 612.335.1500
lowell.noteboom@stinson.com

August 20, 2025

Sarah Patel Pacheco
spacheco@jw.com

Chris Bankler
cbankler@jw.com

Sent by e-mail only

Re: Response to Legal Review for Rachel Polka – Initial Document Requests

Dear Ms. Pacheco and Mr. Bankler:

We have received Ms. Pacheco's letter of August 18, as well as Mr. Bankler's email of August 18 to Shane Swanson.

On August 15, 2025, our office electronically sent the documents discussed in our August 8, 2025 letter to Ms. Pacheco by email. The documents were delivered securely via Citrix link, and confirmed separately by email from our administrative assistant team. Please review and confirm our emails were received.

There are numerous paper and electronic files related to Ross and Polka matters, including dozens of boxes of closed files in our off-site storage facility. We have not retrieved those closed files, but do not believe they include information you have requested. If we discover additional documents responsive to your requests that can be shared with you without consent from other clients, we will share them.

Importantly, there are many documents, including the Olympic Finance corporate documents, which we do not prepare or maintain.

Please understand we want to be cooperative to the extent we are able, consistent with our obligations to other clients. We have provided all we can provide, absent consent from those other clients. As you know, the limitations on our providing documents is not limited to questions of privilege. Our duty of confidentiality prevents us from sharing even non-privileged documents that belong to other clients absent their consent. We encourage you to direct additional document requests to Michael Ross, Adam Ross, Stephanie Ross, and their respective attorneys. We hope you can resolve access issues with them.

If you are aware of any additional basis in Texas law that would require us to disclose any of the additional information you have requested, please advise.

Sincerely,

**Stinson LLP**

Lowell Noteboom

LJN:aaj

Exhibit 5

Chris Bankler
(214) 953-6053 (Direct Dial)
cbankler@jw.com

August 22, 2025

**By E-Mail**

Lowell Noteboom
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
lowell.noteboom@stinson.com

Re: Rachel Polka's Initial Document Requests

Dear Mr. Noteboom:

We are in receipt of your letter sent on August 20 and your preliminary document production sent on August 15. Thank you for sending us those documents.

First, we have repeatedly asked to set up a call with you to help talk through some of these issues. I still believe a phone conversation would help us reach a swift answer and clarification regarding some of these document requests. Please let me know.

Critically, you direct us to Michael Ross, Adam Ross, Stephanie Ross, and their respective attorneys. ***Please provide us with contact information for these individuals and their attorneys.*** I have previously asked Mr. Swanson for the address of Michael Ross's current residence and whether your firm is representing him in the action we filed in Texas. We have not received any response from your firm on this.

A few other follow up issues:

## I. August 20 Letter

First, regarding the paper files in your off-site storage facility, please advise if you will be retrieving those files and conducting a search for any responsive documents that should be provided to Ms. Polka. If you will not be reviewing these documents, please provide your bases as to your belief that the physical files do not contain information belonging to Ms. Polka including what kind of documents are in the off-site storage facility, who they belong to if they do not belong to Ms. Polka, and why they are not relevant to Ms. Polka.

Second, your August 20 letter states that Stinson "want[s] to be cooperative to the extent we are able, consistent with our obligations to other clients." Please advise us as to who or what entities Stinson represents that conflicts with its obligations owed to Ms. Polka. We previously

asked whether Stinson has separate representations and agreements with Olympic Finance and/or Poly-America. Please respond.

Third, we asked for clarity as to the bases for the privileges Stinson asserts for withholding documents from Ms. Polka, including identification of what documents exist, what privilege is being asserted and your legal basis. Notably, none of this was addressed in your August 20 letter. Rather, your letter states that you have a "duty of confidentiality" that prevents the sharing of "even non-privileged documents." Please advise as to what you mean and how this negates your duties owed to Ms. Polka. Additionally, if you are still withholding documents from Ms. Polka on the basis of privilege, please advise as to your bases including identification of what documents exist and what privilege is being asserted.

Fourth, you have asked us to provide "additional basis in Texas law that would require [Stinson] to disclose any of the additional information" requested. Without understanding who Stinson represents, what is being withheld and why, we cannot realistically address this. Please provide us with these answers so we can understand what exactly is even being debated.

## II. <u>Document Production</u>

It appears we are still missing a majority of documents requested by Ms. Polka. Please see the below list of document requests and advise us as to when we can receive these documents.

Given the above confusion as to whether and what Stinson is withholding, please let us know if you are withholding any documents responsive to these requests on the basis of privilege and/or confidentiality. If so, please clearly identify the request and your legal basis for withholding such documentation. Alternatively, if you have provided all information you possess for any of these requests, please let us know.

### A. <u>Entity-Level Information</u>

1. Current capitalization table (showing percentage and class of ownership), governing documents, and any shareholder, partnership or operating agreements—together with all amendments—for each of the following entities:
   - Poly-America Holding Company
   - Olympic Finance Company
   - MARS Partners, Ltd.
   - Western Poly Corporation
   - Poly-Trucking, Inc.
   - Up North Plastics, Inc.
   - MARS II, Inc.
   - BF Nelson Corporation
   - Poly-America, LP and its general partner Poly-America GP, LLC
   - Poly-West, Inc.; Carolina Poly, Inc.; Poly-America International, Inc.; and any other subsidiary or affiliated company reflected on the 1/1/2024 structure chart

• Mars GP, LLC; Ramko Partners Ltd.; and any tiered or special-purpose entities (e.g., Q-SUBs)

2. Copies of all Ms. Polka's (or her trusts) Schedule K-1s and, where applicable, Form 1041 for each trust, and Forms 1120-S or 1065 for each entity for the most recent taxable year.

3. Confirmation of all S-corporation elections (including any QSST or ESBT elections) in effect for shareholders that are trusts. Please include the election forms and IRS acceptance letters.

**B. <u>Trust Information</u>**

1. We believe you provided us with the fully executed trust agreements for the list of trusts below. Please confirm whether that is correct and whether all amendments, restatements, and merger documents have also been provided.
   • 2006 irrevocable trust u/a/d Nov. 7, 2006 (Adam B. Ross 2006 Irrevocable Trust I).
   • 2007 irrevocable trust (Larry M. Ross 2007 Irrevocable Trust) merged into the 2006 trust in 2022 (together with the agreement evidencing the merger).
   • Rachel Beth Polka 2024 Family Revocable Trust.
   • Rachel Beth Polka Revocable Trust dated 1989 (for historical context; I understand it may now be unfunded) and any documents that reflect the transfer of assets from this trust to Rachel, the 2024 Family Revocable Trust, or otherwise.
   • Rachel B. Polka 2013 Irrevocable Insurance Trust.
   • The 1994 GRATs that created Rachel's 2019 Continuation Trust.

2. The most recent filed federal and state income tax returns for the following trust (noting that many of these trusts ceased to be grantor trusts in 2018):
   • Each of the five 2008 Irrevocable Trusts for Rachel's children.
   • Adam B. Ross 2006 Irrevocable Trust I.
   • Kyle Ross 1999 Irrevocable Gift Trust.
   • Rachel B. Polka 2013 Irrevocable Insurance Trust.
   • Any QSST or ESBT associated with the foregoing.

3. Please confirm if you have sent us all federal gift tax returns (Form 709) for gifts by Rachel and any other returns you can provide which might reflect the GST status of the various trusts in your possession.

4. Current balance sheets or other statements of assets and liabilities for the Adam B. Ross 2006 Irrevocable Trust I, Rachel B. Polka 2013 Irrevocable Insurance Trust, the Rachel Polka Revocable Trust and the Rachel B. Polka 2024 Family Revocable Trust, including:
   • Detailed schedules of marketable securities, closely held stock, partnership interests, real property, insurance policies, notes receivable and any split-dollar receivables or premium loans.

- Outstanding liabilities, including notes payable to related parties (e.g., premium financing for the 2013 Insurance Trust).
- Current trustee and protector designations and any resignation or acceptance instruments since the last amendments.

5. Please confirm if you have produced all life-insurance materials including:
   - John Hancock Policies.
   - Any other life-insurance policies owned by, or pledged to, the trusts, together with policy statements showing current cash value and death benefit.

**C. <u>Additional Items</u>**

1. We received the "Ownership Structure as of 1/1/2024" chart. Please let us know if a revised chart exists as of any later valuation date and if so, please provide that as well.

2. Any correspondence, memoranda, or resolutions from 2018-present that relate to:
   - The trusts' decisions to terminate grantor-trust status.
   - QSST or ESBT elections, amendments, or consents.
   - Any proposed or completed sales, redemptions, or recapitalizations of family-owned entities.

3. Please confirm that all information has been provided relating to the administration of Rachel's personal residences, specifically:
   - 3833 Wentwood Drive LLC (University Park home).
   - 10331 Strait Lane, and any associated LLC or management agreement.

4. All communications and documents exchanged between Stinson and Joshua Bierbaum, or anyone else at Pure Insurance, regarding 3833 Wentwood Drive and the home insurance policy.

We appreciate your further cooperation in getting this resolved quickly and amicably. Thank you for your attention to this matter.

Sincerely,

*/s/ Chris Bankler*

Chris Bankler

STINSON

Exhibit 6

**Memorandum**

**To:** Michael Ross

**From:** Shane Swanson

**Re:** Road Map for Preparing the Next Generation

**Date:** July 2, 2024

As you asked, I have spent the last several months talking to people and considering potential paths for you and Rachel to address the future management of your family's assets in a way that maximizes the positive aspects of the family's resources and minimizes its negative impacts, including the burden and strain on you. The main focus of my work has consisted of discussions with professional advisors. Rachel has participated in those discussions in a very thoughtful and meaningful way. She has done this while working through her divorce, work at Wentwood, marketing Strait, getting Cole, Carly and Chloe set for college and working with Luke for the support he needs with college.

In the end, the consistent theme that emerged is that each family is unique and should chart their own path based on the unique needs of the family at any given time. There are many different stages between the initial wealth creation and actually opening a family office if one is indeed ever opened. I do not believe that you need to stand up a family office at this moment, but I do think that you both would benefit now from putting greater structure around family governance and education to prepare Rachel's children and your children to manage the unique benefits, responsibilities and challenges that come from being a member of a wealthy family. The primary purposes of the work should be encouraging and empowering your children to lead productive lives, to help them avoid and resist the influences that lead to attitudes of entitlement, diminished ambition and initiative, and mitigating the potential for family conflict.

This memorandum contains my thoughts on the next steps that I think make sense, particularly for Rachel given the age of her children.

## I. Preparing for Future Succession

At some point, you will no longer be able or willing to oversee the family investments and legal framework, and that transition may happen over time or all at once if something unforeseen were to happen to you. We need to begin the work now of preparing Rachel's family for that transition because there is a steep learning curve and her children are at appropriate ages. Rachel and her children will need to be prepared for what their roles may eventually be, which may involve some management of family assets, management of professionals who manage family assets or simply being equipped to be a responsible, informed beneficiary.

In the near term, there are four areas of focus that warrant work now. They are information sharing, investment education, value articulation, and family governance.

A. Information Sharing

The people with whom we consulted stressed the importance of developing a plan for information sharing to give color to the responsibility that comes from being a member of a wealthy family. Rachel's children have some understanding of the family's wealth based on their upbringing. In addition, Kyle sees the 1% of income from Poly-America on his income tax return each year. But they don't have a full understanding of the extent of the wealth, the history and ownership of Poly-America and Olympic Finance Company, and the trust structure in which the vast majority of the family wealth is held. The advisors affirmatively recommended that the quantitative data not be shared at this point as it may be harmful; rather, they suggested that we gradually provide all relevant information over time in age appropriate manners and tailoring it to each individual family member. In doing so, the advisors recommended qualitative understanding of the family wealth and the need for individual initiative, ambition and accomplishment. Managing this appropriately can help build trust and mitigate resentment of you in particular as the person who has control of the family wealth.

B. Investment Education

Rachel and her children are going to need a more expansive understanding of pure financial literacy, investments and investment management than they currently have. Rachel and her children are each unique, and there are going to be differences in aptitudes and abilities. I think the education process will help give definition to those differences and give you information to consider when you plan for your succession. Rachel is working on this now with her Morgan Stanley advisors and has more knowledge than I anticipated when I began working with her on the proceeds from the sale of her Colorado home.

C. Value Articulation

For all of your differences and disagreements over the years, you and Rachel share remarkable similarities in certain values. Neither of you are interested in living in a manner that would be possible given your resources. You both value maintaining relatively low profiles within the communities in which you live. You are both driven by finding value. This is true even though Rachel spends more than you. You are both deeply concerned about achieving the best possible outcomes for your children. You both value being productive.

It is important to memorialize the values as family principals and to refer to them consistently through interactions with your children. This will give your family the best shot of keeping the children grounded in spite of the significant resources available to them. The family governance experts we consulted repeatedly expressed the view that the single best predictor of long-term success in families is the extent to which the family is aligned around shared values and that it is extremely important to create strategies to articulate those values.

This sounds soft, but I think it is critical. Your children are growing up with much more wealth than you and Rachel had as children. There may be a range of emotions around the wealth, including its purpose, its relationship to each individual and its impact upon his or her self-worth. I see Kyle struggling with this already, including contemplating how he measures up to your father's successes, his search for his own path, his desire to play a leadership role and concerns about achieving independence.

In addition to the emotion, your children will need to be equipped with some of the ability you and Rachel have to not be surrounded by hanger's on.

D. Governance

With the exception of Kyle, each of the grandchildren will have the inherited wealth in trust. The trustee will play a significant role in each grandchild's financial life. There are pitfalls that can come from this including conflict between you as trustee, Rachel as parent, and each grandchild as beneficiary.

The beneficiaries are going to compare what, when and under what circumstances they received with the other beneficiaries. Establishing guidelines, communicating them, and adhering to them will mitigate the risk of conflict. This is particularly important since we are already establishing expectations with Kyle. This would include articulating the expectation that you and Rachel have that your children are productive and find a vocation and managing distributions in ways that encourage that. Importantly, communicating this effectively will help the children make informed decisions in their personal lives.

## II. Additional Estate Planning

Separate from the discussion about preparing the next generation, I implore you to let me establish long-term, dynastic trusts in a jurisdiction such as Delaware, South Dakota or Wyoming for the benefit of you and Rachel and your children using the stock currently owned by the Adam B. Ross 2006 Irrevocable Trust I and Adam B. Ross 2006 Irrevocable Trust II (the "ABR 2006 Trusts"). The ABR 2006 trusts for your benefit were created when the wealth was a fraction of what it is now. These trusts can be improved upon in material ways, but most importantly, by transferring the wealth to trusts that can last indefinitely. Neither you nor Rachel will spend in ways that will slow the growth of the value of the assets, and I think that will be true of your children and grandchildren.

We have the ability to transfer the stock in both of the 2006 trusts to new trusts in the appropriate jurisdictions in the same way that we established the 2006 originally. I would propose that we distribute the stock to each of you, most likely in stages, and sell the stock to trusts you would establish for yourselves in those jurisdictions. You can remain the investment trustee controlling the investments so there would be no interference with the operation of Poly-America or Olympic Finance. We would use an administrative trustee only to confer the jurisdiction and maintain trust records.

I believe time is of the essence for this planning. The power of the income tax liability from Poly-America is the key to transferring vast amounts of family wealth estate tax free. Were you to sell the company, it would be impossible to achieve the same result. In addition, we should at least consider the possibility of tax law changes that would close our ability to engage in this planning given the significant federal deficits and the ratio of national debt to the gross domestic product.

## III. Olympic Finance Company II

Earlier you had suggested creating a second partnership in which Rachel might participate in the management with someone you trusted and from which her family cash needs would be met. For a variety of reasons, I do feel like that is a good idea and encourage you to implement it.

First and foremost, I do think Rachel is capable of undertaking this responsibility at this point, especially if she is surrounded by the right team. She has handled a lot competently in the last 18 months. She solicit and accepts advice, and she is invested in the outcome with her children. Finally, it would be an effective way of equipping her for more responsibility in the future.

Second, she is going to need to have some meaningful funds to oversee to get the support of the advisors who can successfully implement the long-term plan outlined above.

Third, I think it would continue to eliminate any friction between you and Rachel related to your control or perceived control of her financial affairs. I think you have benefitted from reduced stress in the past year and enjoyed a more traditional sibling relationship with her. This will only continue that.

**IV. Possible Delegation of Distribution Decisions**

In the event that putting structure around how distribution decisions are made, I think that you and Rachel should give some consideration to giving distribution decisions to someone other than the three of us, but guided by principles upon which you and Rachel set. I think there is a big shift in the perceptions around advice that you, Rachel and I provide in our various roles if there is not a real or perceived connection to distribution decisions. This is not to say that you and Rachel should not retain the power to replace the decision maker and provide guidance for how the decisions are made.

SS: